**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| PAIGE ALEXANDRIA BRAUN, | ) | CASE NO. 1:20-CV-00374-JPC |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I. Introduction

Plaintiff, Paige Alexandria Braun ("Braun" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

### II. Procedural History

On March 22, 2018, Claimant filed an application for DIB, and on April 20, 2016, for SSI, alleging a disability onset date of November 18, 1995.  The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 10, PageID #161).  On January 10, 2019, an ALJ held a hearing, during which Braun, represented by counsel, and an impartial vocational expert testified.  (ECF No. 10, PageID #97-124).  On February 13, 2019, the ALJ issued a written decision finding Claimant was not

1

disabled.  (ECF No. 10, PageID #77-96). The ALJ's decision became final on December 27, 2019,

when the Appeals Council declined further review.  (ECF No. 10, PageID #66).

On February 19, 2020, Claimant filed her Complaint to challenge the Commissioner's final

decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 14, 16, 17).

Claimant asserts the following assignments of error:

> 1. The ALJ erred when she failed to properly evaluate the evidence
>    and when she failed to accord controlling weight to the opinion
>    of the treating psychiatrist, Dr. Terence Witham.
>
> 2. The ALJ erred when she failed to order a supplemental hearing
>    as requested and then erred in her Step Five analysis when she
>    improperly found that there were jobs Braun could perform in
>    the national economy.

(ECF No. 14 at 1).

## III. Background

### A. Relevant Hearing Testimony

#### 1. Braun's Testimony

Braun was 23 years old at the time of the administrative hearing and is considered a

younger individual at all times relevant to this matter. (ECF No. 10, PageID #103). Braun lived at

home with her parents, sister, and niece.  (ECF No. 10, PageID #103). She had a driver's license

and was able to drive a car. (ECF No. 10, PageID #104).

Braun graduated from high school and worked at several jobs, both "on" and "off book",

which did not rise to the level of substantial gainful activity. (ECF No. 10, PageID #104-105, 114-

115). She testified that she had difficulty getting along with her coworkers and with remembering

instructions and performing fast pace tasks. (ECF No. 10, PageID #105-108). She testified that

during at least one job she had to ask for assistance four or five times every shift.  (ECF No. 10,

PageID #117-118).

On a typical day, she slept until 3:00 p.m., went to the gym, watched television, and went to bed at around 11:00 p.m. (ECF No. 10, PageID #108-109). She sometimes did some chores around the house, and occasionally went grocery shopping, but she usually stayed in her room. (ECF No. 10, PageID #109-110). Braun had two friends, one of whom she had recently went to Myrtle Beach with for several weeks. (ECF No. 10, PageID #111). She testified that she was often noncompliant with her medication schedule and had never consistently taken her medications for six straight months. (ECF No. 10, PageID #111). Braun acknowledged that when she took her medications she got along better with others. (ECF No. 10, PageID #112).

    2.  Vocational Expert - Thomas Nimberger

Thomas Nimberger testified as a vocational expert at the hearing. The ALJ posed the following hypothetical question:

> assume a hypothetical individual the claimant's age and education with the past jobs you described and further assume that this individual would be limited to non-exertional limits, specifically limited to perform simple, routine, and repetitive tasks but not at a production rate pace, with only occasional interaction with supervisors and coworkers, never any interaction with the public, and would be limited to tolerating few changes in a routine work setting.

(ECF No. 10, PageID #121). The vocational expert testified that such a person could not perform Braun's past work, but could perform other jobs such as packager, a laundry worker, or an industrial cleaner (sweeper). (ECF No. 10, PageID #121-122). In a second hypothetical question, the ALJ added that the person would be off task twenty percent or more of the workday. (ECF No. 10, PageID #122). In response, the vocational expert said such a person would not be competitive enough or productive enough for work. (ECF No. 10, PageID #122). The ALJ then asked about a person working in an isolated work environment, to which the vocational expert indicated that there would be no work available. (ECF No. 10, PageID #122). Braun's attorney asked the

vocational expert how an individual's need to receive redirection or retraining for a coworker or supervisor four or five times per shift would affect the hypothetical. (ECF No. 10, PageID #123). The vocational expert replied that would require more than normal supervision and an accommodation leading to no work. (ECF No. 10, PageID #123).

### 3. Rebuttal Testimony - Mark Heckman

Following the administrative hearing, Braun submitted a Memorandum of Law in which she alleged that she was unfairly surprised by the vocational expert's testimony. (ECF No.10, PageID #429). Therefore, Braun argued that a supplemental hearing was necessary under the Agency's Hearings, Appeals Litigation and Law Manual (HALLEX) I-2-6-80. (ECF No.10, PageID #429).

With her Memorandum of Law, Braun submitted a report from Mark L. Heckman, M.Ed., a vocational rehabilitation counselor. (ECF No. 10, PageID #437). Heckman stated that he had reviewed the vocational expert's hearing testimony and disagreed with the vocational expert's conclusions. (ECF No. 10, PageID #437). He opined that the jobs that the vocational expert identified could not be performed by an individual with Braun's residual functional capacity. (ECF No. 10, PageID #437). Additionally, Heckman opined that the answers of the vocational expert during the hearing were inappropriate because of the age of the Dictionary of Occupational Titles. (ECF No. 10, PageID #438).

The ALJ gave Heckman's opinion little weight and explained:

> claimant had noted that in past workplaces, her tolerance for interaction with supervisors was "alright" (4F/2), and during a six-month course of vocational rehabilitation, there was no report of interpersonal difficulties (25E/26), (25E/29). The hypothetical questions developed during the hearing of necessity contemplate a period lengthier than a probationary period. Little weight is afforded this portion of his opinion. As to the second portion of his opinion, there is no information or argument so compelling as to cause the

4

undersigned to disregard the testimony of the vocational expert provided during the hearing.

(ECF No. 10, PageID #89).

### B. Medical Evidence

The ALJ also summarized Braun's health records and symptoms:

> The claimant was diagnosed with other bipolar disorder and attention deficit-hyperactivity disorder, each on September 14, 2015 (2F/l). She was diagnosed with unspecified disruptive, impulse control and conduct disorder, and borderline intellectual function, each on December 30, 2016 (4F/6). Her last IEP, dated February 28, 2014, concluded that she would be afforded services for a specific learning disability (1F/30). While these findings would be consistent with the claimant's allegations of social and attentional deficits, the record, when considered as a whole, is not supportive of the contention that the existence of these impairments would be preclusive of all types of work.
>
> The claimant has been prescribed a regimen of psychotropic medications intended to address these impairments (2E/5), (18E), used without report of side effects (7E/4), (10E/5), and on which she is said to do "fairly well" (6F/8, 14). However, her compliance is, at best, partial (6F/l, 5). Mental status examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or normal findings, including one dated December 30, 2016, which reported that the claimant presented with intellectual function in the borderline-to-low average range, but also with fair hygiene, composed and appropriate behavior and eye contact, a linear thought process, 'very normal' affect, stable mood, no overt signs of anxiety, no psychoses, suicidal or homicidal ideation, and with fair insight and judgment (4F/4-5), one dated December 13, 2017, which reported that the claimant presented with impaired insight, judgment and impulse control, a constricted and irritable affect, but also with casual dress and well groomed, a logical thought process, more completely engaged, with no psychoses, no suicidal or homicidal ideation, and a good fund of knowledge (6F/9), or one dated November 8, 2018, which indicated that the claimant presented with impaired insight, judgment and impulse control, a constricted and irritable affect, but also with casual dress and well groomed, a logical thought process, more completely engaged, with no psychoses, no suicidal or homicidal ideation, and a good fund of knowledge (6F/2).

The claimant has received comparatively few global assessment of function scores, ranging from a  low of fifty (5F/61), indicative of serious difficulties of social or occupational function, to a  high of fifty-five (6F/9), denoting no  more than  moderate difficulties of social or occupational  function. However, this comparative scarcity of issuance renders highly dubious, the value of these scores as an analytical  tool. Global  Assessment  of  Function  Scores  were intended to alert treatment providers to the patient's level of function during  a  specified  period.  If  no  period  was  specified,  they  were effective only as to the date issued.  Nowhere in this claim are these scores issued with sufficient regularity as to permit the inference of a particular level of function, or  even a particular range of function, for one full year, and so, by definition, these scores do not  constitute an opinion addressed to a severe impairment.  Such validity as they may have once had is now further diluted by the discontinuance of their use in the Diagnostic and Statistical Manual of Mental Illness-Fifth Edition, now in general use.  These scores cannot serve as any useful  basis  in  arriving  at  the  conclusions  announced  in  this Decision.

In  sum,  the  evidence  would  indicate  that  the  symptom  limitations relevant  to  these  impairments  are  not  as  severe  as  alleged.  In  a setting where the claimant would be restricted to the performance of simple, routine, repetitive tasks, undertaken in a work setting free of production rate pace [as  is found in assembly line work], which setting  requires  no  interaction  with  the  public  and  no  more  than occasional interaction with co-workers or supervisors, and, which setting is routine, in that  it contemplates few changes in workplace tasks or duties, adequate allowance will have been made for these impairments.

(ECF No. 10, PageID #86-87).

### C.  Opinion Evidence at Issue

1.  Terence Witham, M.D.

On September 14, 2015, Braun's treating psychiatrist, Dr. Terence Witham, completed an emotional capacities evaluation form. (ECF No. 10, PageID #492). Dr. Witham opined that Braun would have significant problems with the following: ability to understand and remember detailed instructions, ability  to  carry  out  detailed  instructions,  ability  to  maintain  attention  and concentration for periods of time, ability  to  make  simple  work-related decisions, ability  to

6

complete a work day without interruptions from symptoms, ability to maintain socially appropriate behavior, ability to accept instructions, ability to respond appropriately to criticism from supervisor, ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, ability to respond appropriately to changes in the work setting ability to set realistic goals or make plans independently of others, and requires additional supervision to carry out detailed work assignments. (ECF No. 10, PageID #492).

The ALJ gave Dr. Witham's opinion partial weight explaining that Dr. Witham failed to further define "significant problems" and that the opinion is not consistent with his own treatment notes and only partially consistent with the record as a whole. (ECF No. 10, PageID #88).

Braun appeals from the ALJ's decision giving Dr. Witham's opinion less than controlling weight.

    2.  Consultative Psychological Examiner - Joshua Magleby, PhD.

On December 30, 2016, Braun was examined by consultative psychological examiner Dr. Joshua Magleby. (ECF No. 10, PageID #533). Dr. Magleby issued his report on January 9, 2017. (ECF No. 10, PageID #539). In his function assessment of Braun, Dr. Magleby opined:

> 1)  The claimant's ability to understand, remember and carry out simple oral instructions is similar compared to other adults the same age based on this exam. On this exam the claimant has clearly shown the ability to follow the examiner's questions and directions, oral instructions on mental status and provide simple appropriate responses. Comprehension seemed fairly average. Memory appeared fairly average. The claimant's ability to follow more complex instructions or directions appeared to be somewhat impaired for age expectations.
>
> 2)  The claimant was not overly distracted on exam and seemed able to follow the procedures. The claimant's ability to maintain attention and concentration seemed fairly average compared to other adults the same age. Persistence and pace in providing personal information and responses to mental status appeared fairly normal compared to other adults the same age. The ability to

perform a simple repetitive task, based on mental status and history, appeared fairly average. The ability to perform multi-step tasks appeared at least somewhat impaired for age expectation, with extremely low performance on WAIS-IV working memory measures.

3) The claimant's ability to relate to others, such as, peers, fellow workers and/or supervisors has been somewhat impaired by what appears to be impulsivity and mood dysregulation, both of which appear to be longstanding; her social relating during this evaluation was fairly appropriate, however. This is supported by reports of past social adaptive behaviors, past relationships, and current relationship and social history.

4) From a psychiatric standpoint, the claimant's ability to withstand the mental stress and pressures associated with day-to-day work activity appears somewhat impaired, mostly by mood dysregulation. This is supported by the claimant's current mental complaints on this exam, psychiatric history and estimated adaptive behaviors at this time.

(ECF No. 10, PageID #539). The ALJ gave Dr. Magleby's opinion partial weight and explained:

Dr. Magleby examined the claimant on a single occasion and was reporting within the bounds of his professional certifications and specialty. As this opinion indicates limitations in each of the four, psychologically based, work-related areas of function, it is at least partially consistent with, and supported by, the overall evidence of record, discussed in digest form in the analysis of [state agency reviewing psychologists] Drs. Rudy and Rivera, above. However, as to the specific degree of work-related limitation that would appertain, this opinion is vague and therefore less than helpful.

(ECF No. 10, PageID #89). Braun argues that the ALJ ignored Dr. Magleby's assessed functional limitations and erred by according the opinion only partial weight. (ECF No. 14 at 11).

> 3. State Agency Reviewing Psychologists – Leslie Rudy, PhD., and Aracelis Rivera, Psy.D.

On January 12, 2017, Leslie Rudy, Ph.D., a state agency psychologist, reviewed the evidence and opined that Braun had a moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration,

persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (ECF No. 10, PageID #132). On April 24, 2017, Arecelis Rivera, Psy.D., reviewed the record on reconsideration and opined that Braun was moderately limited in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (ECF No. 10, PageID #145). Both Dr. Rudy and Dr. Rivera opined that Braun would be capable of performing simple one-to-three step tasks, undertaken in a work setting free of fast pace or high production quotas, with only occasional and superficial interaction with others, in a relatively static setting. (ECF No. 10, PageID #136-37, 147-149). The ALJ gave these opinions considerable weight and explained:

> Each of these doctors had the opportunity to review the evidence of record, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims.  […] In a setting where the claimant  would be restricted to simple, routine, repetitive tasks to begin with, in a setting free of  frustration-inducing production pressures, and where changes in workplace tasks and duties would be  few, she appears to have sufficient, residual, adaptive function to engage in competitive work. These opinions are largely consistent with, and supported by, the overall evidence of record.   However, they appear to overstate, to slight degree, the claimant's residual capacity for social interaction.

(ECF No. 10, PageID #67-68). Braun argues that the ALJ erroneously disregarded the state agency psychologists' notations that Braun has no filter and a history of leaving jobs due to social issues. (ECF No. 14 at 10-11).

## IV.  The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3.  The claimant has the following severe impairments: other bipolar disorder, unspecified disruptive, impulse control and conduct disorder, borderline intellectual function, specific learning disability and attention deficit-hyperactivity disorder (20 CFR 404.1520(c) and 416.920(C)).

4.    The claimant does not have an impairment or combination of impairments that meets or  medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,  Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has  the residual functional capacity to perform a full range of work at all exertional levels but with  the following nonexertional limitations: the claimant is limited to the performance of simple,  routine, repetitive tasks, undertaken in a work setting free of production rate pace [as is found  in assembly line work], which setting requires no interaction with the public and no more than  occasional interaction with co-workers or supervisors, which setting is routine, in that it contemplates few changes in workplace tasks or duties.

10.    Considering the claimant's age, education, work experience, and residual functional capacity,  there are jobs that exist in significant numbers in the national economy that the claimant can  perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from November 18, 1995, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott*

*v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B.  Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C.  Discussion

Braun raises two issues on appeal: 1) whether the ALJ erred by failing to properly evaluate the evidence and by according less than controlling weight to the opinion of the treating

psychiatrist Dr. Terence Witham; and 2) whether the ALJ erred at Step Five by not ordering a supplemental hearing and by finding that jobs existed in the national economy that Braun could perform. Within the first assignment of error, Braun raises several sub-issues: whether the ALJ properly considered the Opportunities for Ohioans with Disabilities (OOD) records and the fact that a probate court had declared Braun incompetent; whether the ALJ erred by finding Braun did not meet a listing; and whether the ALJ gave proper consideration to the various medical opinions, not just that of Dr. Witham. The Court addresses each of Braun's arguments in turn.

### 1.  Medical Source Opinions

#### a.  Treating Source Rule[1]

Under the treating source rule, an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006)[3])). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. Braun filed her SSI claim on October 14, 2016, before the revision took effect. Although she then filed her DIB claim on April 11, 2018, the earlier of the two dates is used to determine which set of rules applies. *See* Social Security Administration's Program Operations Manual System (POMS) Section DI 24503.050D.2 (https://secure.ssa.gov/poms.nsf/lnx/0424503050).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

On September 14, 2015, Dr. Witham opined that Braun "would have significant problems understanding, remembering and carrying out instructions, that she would have significant problems with concentration, persistence and pace to perform detailed instructions, to maintain attention and concentration, to make simple decisions, to complete a workday without interruption from symptom, to receive criticism, to get along with co-workers, to respond to changes, set goals,

work independently, or to perform detailed tasks without additional supervision." (ECF No. 10 at 28, PageID #88). Braun argues the ALJ erred by failing to give Dr. Witham's opinion controlling weight.

The ALJ gave Dr. Witham's opinion partial weight and explained that Dr. Witham's treating source opinion was not entitled to controlling weight because it failed to explain "significant problems" and the "opinion is not entirely consistent with Dr. Witham's own treatment notes, which universally describe the claimant as 'more completely engaged', possessed of intact memory function and a good fund of knowledge (6F/2, 6, 9, 12, 15, 18, 21)." (ECF No. 10, PageID #88). The ALJ then assigned partial weight to Dr. Witham's opinion, explaining that it "describe[s] limitations in each of the four, psychologically-based, work-related areas of function and for this reason, the opinion is partially consistent with, and supported by, the overall evidence of record, described in digest form in the preceding paragraph[.]" (ECF No. 10, PageID #88).

Typically, an ALJ "must" give a treating source opinion controlling weight so long as the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley*, 581 F.3d at 406 (citations omitted); 20 C.F.R. § 404.1527(d)(2). Here, the ALJ did not error by giving Dr. Witham's opinion less than controlling weight.

Dr. Witham gave his opinion on a form on which he indicated by circling one of three options – "none"; "some"; or "significant" – the level of impact Braun's condition had on various abilities. Although Dr. Witham circled that Braun's condition would significantly impact several abilities, he did not include any explanation as to what classified as "significant" impact and the form did not define the levels either. Dr. Witham's medical records do not enlighten the Court as

14

to how Braun's abilities are "significantly" impacted due to her condition. (*See generally* ECF No. 10, PageID #542-593). In early treatment Braun presented with several severe symptoms such as rapid speech and irritability; however, such symptoms showed improvement with continued treatment. (*See e.g.* ECF No. 10, PageID #551, 572, 582). Although Dr. Witham's records indicate that Braun requires lifelong treatment for her bipolar disorder, the records do not support any significant limitations as suggested in his opinion. Dr. Witham's records after September 14, 2015 (the date of the opinion), also do not support his opinion that Braun would have significant limitations in her abilities. (*See generally* ECF No. 10, PageID #594-602, 605-626). Although these records recognize impaired impulse control, insight, and judgment, they also reference that Braun is "engaged more completely", alert and oriented x 3, possesses intact memory function, and displays a good fund of general knowledge. (*See e.g.*, ECF No. 10, PageID #606, 610, 613, 616).

Finally, Dr. Witham's opinion that Braun's condition "significantly" impacted certain abilities is not consistent with the remainder of the record. Braun admits that she is able to function in public settings, such as shopping centers and the gym (ECF No. 10, PageID #109-110); Dr. Magleby found her to have a fair ability to get along with family, friends, and members of the community (ECF No. 10, PageID #535); and, in 2017, Braun went to Myrtle Beach and lived there with a friend for several months (ECF No. 10, PageID #111, 605). Dr. Magleby also found that Braun had fair insight and judgment with functional adaptive and coping skills (ECF No. 10, PageID #88, 537), and Braun's vocational rehabilitation records reflect that although Braun changed jobs several times, it was in order to secure more hours, not because of difficulties getting along with others or problems with adaptation (ECF No. 10, PageID #423, 426, 605).

Accordingly, because Dr. Witham's opinion was not supported by his medical notes and inconsistent with substantial evidence in the record, the Court finds that find that the ALJ did not err by giving Dr. Witham's opinion less than controlling weight.

That, however, does not end the inquiry. "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, …, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence,…, § 404.1527(c)(2)-(6)." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (internal citations omitted); "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, 710 F.3d at 376 (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

The ALJ explained:

> Dr. Witham has treated the claimant over a lengthy period and is reporting within the bounds of his professional certifications and specialty. However, "significant problems" is not further defined. In addition, this opinion is not entirely consistent with Dr. Witham's

own treatment notes, which universally describe the claimant as "more completely engaged", possessed of intact memory function and a good fund of knowledge (6F/2, 6, 9, 12, 15, 18, 21). For these reasons, the opinion is not eligible to be considered for assignment of controlling weight. Otherwise, the opinion does describe limitations in each of the four, psychologically-based, work-related areas of function and for this reason, the opinion is partially consistent with, and  supported by, the overall evidence of record, described in digest form in the preceding paragraph, and in consequence, is afforded partial weight.

(ECF No. 10, PageID #68).[2] Here, the ALJ's decision assigned "partial weight" to Dr. Witham's opinion and supported that determination both by the medical evidence in the record as a whole and by Dr. Witham's own medical records specifically. Although substantial inconsistent evidence in the record alone is not enough (*Wilson*, 378 F.3d at 546), the ALJ also explained that Dr. Witham's own records do not support his opinion of significant impediments. Finally, a subsequent viewer can clearly understand the ALJ's reasons for the weight given. Accordingly, the ALJ gave "good reasons" for according Dr. Witham's opinion partial weight.

b.  Consultative Examiner

Next, we turn to the opinion of the consultative examiner, Dr. Magleby who examined Braun on December 30, 2016 at the request of the state agency. After the examination, Dr. Magleby diagnosed Braun with unspecified neurodevelopmental disorder, unspecified disruptive, impulse-control, and conduct disorder, and borderline intellectual functioning. (ECF No. 10, PageID #538). Dr. Magleby noted that Braun had a fair response to simple directions with poor testing on serial 7's. (ECF No. 10, PageID #537). He also performed IQ testing, which revealed a working memory IQ of 66, and a full-scale IQ of 76. (ECF No. 10, PageID #537). In his functional assessment of Braun, Dr. Magleby concluded that Braun's "ability to withstand the mental stress and pressures

---

[2] The preceding paragraph analyzed the opinions of the state agency reviewing physicians and the supporting record evidence. (*See* ECF No. 10, PageID #87-88).

associated with day-to-day work activity appears somewhat impaired, mostly by mood dysregulation." (ECF No. 10, PageID #539). Braun argues that the ALJ erred by giving Dr. Magleby's opinion only partial weight and "ignoring" Dr. Magleby's opinion that Braun would have difficulties getting along with others and the limitation placed on Braun's "ability to engage in substantial gainful activity on a sustained basis." (ECF No. 14 at 11). The Commissioner argues that the ALJ properly noted that "Dr. Magleby's opinion about the specific degree of work-related limitation in each area ('somewhat impaired for age expectations') was vague and, therefore, less than helpful" and provided a reasonable explanation based on the record evidence for the weight she assigned to the opinion. (ECF No. 16 at 14).

For medical sources who offer opinions but are not treating physicians, an ALJ is to consider the factors set forth in 20 C.F.R. § 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). Although "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. An ALJ need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Smith*, 482 F.3d at 876 ("[T]he SSA requires ALJs to give reasons for only treating sources."). ALJs must only provide a meaningful explanation regarding the weight given to particular medical source opinions. *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019); *see* SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore

these opinions and must explain the weight given to the opinions in their decisions."); 20 C.F.R. § 416.927(c) (listing the factors to be considered in deciding the weight given to any medical opinion").

Dr. Magleby opined that Braun could understand, remember, and carry out simple oral instructions; she could perform a simple repetitive task; her ability to relate to others had been somewhat impaired; and her ability to withstand the mental stress and pressures associated with day-to-day work appeared somewhat impaired. Braun argues that the ALJ erred by ignoring the functional limitation opined by Dr. Magleby and giving his opinion "partial weight". However, the Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion. *See Martin*, 658 F. App'x at 259 ("Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public— as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."). All that was required was for the ALJ to "say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (citation and internal quotations omitted).

Here, the ALJ explained:

> Dr. Magleby examined the claimant on a single occasion and was reporting within the bounds of his professional certifications and specialty. As this opinion indicates limitations in each of the four, psychologically based, work-related areas of function, it is at least partially consistent with, and supported by, the overall evidence of record, discussed in digest form in the analysis of Drs. Rudy and Rivera, above. However, as to the specific degree of work-related limitation that would appertain, this opinion is vague and therefore less than helpful. In consequence, the opinion is afforded only partial weight.

19

(ECF No. 10, PageID #89). The ALJ's explanation reaches several of the factors outlined in 20 C.F.R. § 416.927(c): the length of the examining relationship; supportability; consistency with the record as a whole; and Dr. Magleby's specialty. Accordingly, the ALJ's explanation provides a meaningful explanation regarding the weight given to Dr. Magleby's opinion.

Moreover, with respect to Braun's argument that the ALJ ignored specific limitations related to her ability to get along with others, the ALJ found that Dr. Magleby's opinion was "vague" and "less than helpful". Indeed, the opinion merely states that Braun's "ability to relate to others, such as, peers, fellow workers and/or supervisors has been somewhat impaired by what appears to be impulsivity and mood dysregulation, both of which appear to be longstanding[.]" He further noted, however, that "her social relating during this evaluation was fairly appropriate, however." (ECF No. 10, PageID #539). Contrary to Braun's assertion, Dr. Magleby's report does not contain any specific limitations related to her ability to get along with others. The RFC includes a limitation that Braun have no interaction with the public and no more than occasional interaction with co-workers or supervisors. There is nothing in Dr. Magleby's report suggesting further limitation is required. For example, in addition to concluding that she "somewhat impaired" in this area, Dr. Magleby's report also indicates that Braun's social activities appear "fairly appropriate" with adequate social support and that "[g]etting along with friends, neighbors or peers appears fair." (ECF No. 10, PageID #535).

Accordingly, the Court find that the ALJ did not ignore Dr. Magleby's opinion, but, rather, gave it proper consideration and accorded it proper weight supported by substantial evidence.

c. State Agency Reviewing Psychologists

Braun does not challenge the weight given to the state agency reviewing psychologists, Dr. Rudy and Dr. Rivera. Instead, Braun argues that since the ALJ gave these opinions considerable

weight, the ALJ erred by disregarding their notations that Braun has no filter and a history of leaving jobs due to social issues and failing to include such limitations in the RFC. (ECF No. 14 at 10-11). First, these notations were not the doctors' observations, rather the restatement of the reports from Braun's parent. (*See* ECF No. 10; 136, 148 ("Parent reports that [claimant] 'has no filter' and indicates a history of leaving jobs due to social issues.")).

Second, the ALJ does not disregard these notations and specifically addresses the assertion that Braun has "no filter" and her alleged inability to keep a job due to her failure to interact appropriately with others. (ECF No. 10, PageID #87-88). Specifically, the ALJ states:

> The claimant's mother reports that she has 'no filter' (6E/l), and the claimant describes difficulties getting along with others (hearing testimony). However, the claimant has no adult forensic history (4F/3). She is able to function in public settings, such as shopping centers or gymnasiums (hearing testimony), (6E/l). The consultative examiner notes that her ability to get along with family, friends and community others is fair (4F/3). In 2017, the claimant and a friend lived in Myrtle Beach, South Carolina and Daytona Beach, Florida for several months (6F/l). During a six-month course of vocational rehabilitation, sponsored by the State of Ohio, the claimant did change jobs several times, but in order to secure more hours (25E/26, 29), not because of any difficulties with others.

(ECF No. 10, PageID #87-88). The ALJ then found that "[i]n a setting where the claimant's interaction would be restricted to familiar others, and where that interaction would also be restricted to occasional, she appears to have retained sufficient, residual, social function to engage in competitive work." (ECF No. 10, PageID #88). Accordingly, Braun's assertion that the ALJ disregarded these (alleged) limitations is incorrect.

Finally, even assuming that the ALJ failed to note a restriction that was included by the state agency reviewing psychologists, there was no error as she is not required to explain every omitted restriction from a non-treating physician's opinion. *See Martin*, 658 F. App'x at 259. The ALJ need only "say enough to allow the appellate court to trace the path of his reasoning." *Stacey*,

451 F. App'x at 519 (citation and internal quotations omitted). The ALJ did that here. Despite the statement from Braun's parent regarding Braun's lack of a filter, both Dr. Rudy and Dr. Rivera found that Braun was "not significantly limited" in her ability to maintain socially appropriate behavior. (ECF No. 10, PageID #136, 148). Both doctors also noted that Braun is able to interact on an occasional and superficial basis. (ECF No. 10, PageID #136, 148). The ALJ found that Dr. Rudy's and Dr. Rivera's opinions slightly overstated Braun's capacity for social interaction and included a limitation in the RFC that Braun have no interaction with the public and no more than occasional interaction with co-workers or supervisors. Moreover, the ALJ explained that the evidence supported that Braun's job changes were due to her desire for more hours rather than her ability to get along with coworkers and supervisors. Accordingly, the ALJ provided "a meaningful explanation regarding the weight given" to these opinions. *See Mason*, 2019 WL 4305764 at *7.

Substantial evidence supports the ALJ's decision.

> d. The ALJ did not err by giving the state agency reviewing psychologists' opinions more weight than the opinions of Drs. Witham and Magleby.

In her reply brief, Braun raises an additional argument that the ALJ erred by giving her treating (Dr. Witham) and examining (Dr. Magleby) physicians' opinions less weight than that of the non-treating/non-examining medical opinions. (ECF No. 17 at 2).[3] It is well established that arguments made for the first time in a reply brief are waived. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004)). Nonetheless, this argument has no merit.

"As a general matter, an opinion from a medical source who has examined a claimant is

---

[3] Although in her initial brief Braun cites case law regarding the general rule that treating source opinion are given more weight than non-treating source opinions, she provides no argument on this issue. (*See* ECF No. 14 at 15).

22

given more weight than that from a source who has not performed an examination (a 'nonexamining source'), id. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), id. § 404.1502, 404.1527(c)(2)." *Gayheart,* 710 F.3d at 375. "In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources." Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996); *see Blakley*, 581 F.3d at 409 (an "ALJ's decision to accord greater weight to state agency physicians over Blakley's treating sources was not, by itself, reversible error.").

Notably, Braun's initial brief does not argue that the ALJ gave improper weight to the state agency reviewing psychologists' opinions, nor does she do so in her reply. Instead, it appears that Braun believes that the ALJ erred by not giving Dr. Witham and Dr. Magleby's opinions more weight than the state agency physicians. Braun does not develop this argument further in her reply. (*See* ECF No. 17 at 2). As discussed above, the ALJ did not err by giving Dr. Witham or Dr. Magleby's opinions partial weight. Accordingly, substantial evidence supports the ALJ's decision to give greater weight to the state agency reviewing psychologists' opinions over the treating and examining source opinions.

2. Step 3: Substantial Evidence Supports the ALJ's Evaluation of Listings 12.04, 12.08, and 12.11.

Braun argues that the ALJ erred in her "B criteria" evaluation of Listings 12.04 (depressive, bipolar, and related disorders), 12.08 (personality and impulse-control disorders), and 12.11

23

(neurodevelopmental disorders).[4] The Commissioner argues that the ALJ reasonably concluded that Braun had no more than moderate limitations in any of the paragraph B criteria of the listings. The ALJ found that Braun did not meet Listings 12.04, 12.08, and 12.11 because she had only a moderate limitation in understanding, remembering, or applying information; moderate limitation in concentrating, persisting, or maintaining pace; moderate limitation in managing himself; and moderate limitation in interacting with others. (ECF. No. 10, PageID #84).

To satisfy paragraph B, Braun must also show extreme limitation of one or marked limitation of two of the following: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.04(B), 12.08(B), 12.11(B). "A marked limitation may arise where several activities or functions are impaired or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652-53 (6th Cir. 2009). A moderate limitation is defined as having a fair ability to function independently, appropriately, effectively, and on a sustained basis in an area. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00F.2.c.

      i.   Understand, remember, or apply information (paragraph B1).

"This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(1). " Examples

---

[4] Listings 12.08 and 12.11 each require an extreme limitation of one, or marked limitation of two, of the paragraph B categories. Listing 12.04 requires either (1) an extreme limitation of one, or marked limitation of two, of the paragraph B categories or (2) a serious and persistent impairment, documented over a period of at least two years, with ongoing treatment and evidence of only marginal adjustment as indicated by the paragraph C criteria. See, 20 C.F.R. Pt. 404, Subpt. P. App. 1, §§ 12.00, 12.04, 12.08, and 12.11. Here, Braun does not challenge the ALJ's findings under paragraph C (for Listing 12.04), only those under paragraph B.

include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." *Id.*

Braun argues that Dr Magleby's opinion that she appeared "somewhat impaired" with her ability to follow more complex instructions or directions supports a greater than "moderate" limitation. (ECF No. 14 at 16). Additionally, Braun argues that her school records demonstrate a problem with reading fluency, comprehension, written expression, basic reading, math, and problem solving and that "[w]hen she was in the eleventh grade, Braun completed Tests of Achievement and tested from below kindergarten for story recall to grade 7.6 for writing fluency" and was exempt from the Ohio Graduation Tests. Braun argues that these facts demonstrate a marked limitation in understanding, remembering, and applying information. (ECF No. 14 at 17).

The record supports the ALJ's determination that Braun has moderate limitation in understanding, remembering, or applying information. Braun tested in the borderline range of intellectual functioning with a full-scale IQ score of 76 and her mental status intelligence was estimated to be "low average to borderline" with fairly average overall mental processing speed. (ECF No. 10, PageID #537). Dr. Magleby's consultative examination report indicated that Braun exhibited good ability to understand and comprehend simple and complex language and directions, and she was able to recall five digits forward, and four in reverse, and recall three items after a delay (ECF No. 10, PageID #536, 537). Braun's own psychiatrist, Dr. Witham, consistently reported that Braun's recent and remote memory were intact and that she had a good fund of knowledge. (ECF No. 10, PageID #606, 617, 625).

These facts support a finding that Braun had a fair ability to function independently, appropriately, effectively, and on a sustained basis in the area of understanding, remembering, or applying information. Accordingly, substantial evidence supports the ALJ's determination that Braun had moderate limitation in understanding, remembering, or applying information.

> ii.     Interact with others (paragraph B2).

"This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(2). "Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id*.

The ALJ found that Braun had a moderate limitation in her ability to interact with others and substantial evidence supports the ALJ's conclusion. Braun argues that the OOD reports support the conclusion that she has a marked limitation in interacting with others. (ECF No. 14 at 17).  However, as discussed above, the OOD report demonstrates that Braun's frequent job changes while at OOD were related to her desire to secure more hours. Additionally, the records demonstrate that she got along well with her supervisors (*see e.g.* ECF No. 10 at 363-366) and her difficulties with others was "situation-dependent"; for example, Dr. Magleby noted "[r]elationships with co-workers [varied from place to place] but the father adds that she usually did not get along with one or more co-worker, and with supervisors 'alright'" (ECF No. 10, PageID #534). Additionally, Braun was able to spend months on vacation with a friend. (ECF No. 10, PageID #605). The ALJ also noted that Braun was able to function in public places such as

shopping or going to the gym. (ECF No. 10, PageID #84). Dr. Magleby found that Braun was "composed and appropriate" and that she made appropriate eye contact. (ECF No. 10, PageID #536).

These facts support a finding that Braun had a fair ability to function independently, appropriately, effectively, and on a sustained basis in the area of interacting with others. Accordingly, the ALJ's determination that Braun suffered moderate limitation in her ability to interact with others is supported by substantial evidence.

      iii.    Concentrate, persist, or maintain pace (paragraph B3)

The ALJ found that Braun had moderate limitations in concentrating, persisting, or maintaining pace. Braun argues that her "school records [ ] and Dr. Magleby's finding that she was 'impulsive in responding'" support a finding that she suffered greater than a moderate limitation in her ability to concentrate, persist, or maintain pace. (ECF No. 14 at 17). Substantial evidence supports the ALJ's conclusion.

Although Braun reported that she lost two jobs because she moved too slowly, she left other placements on her own decision due to wanting to obtain more hours. Braun tested in the borderline range of intellectual functioning and her treatment notes repeatedly referred to her as "more completely engaged". Further, the record demonstrates that Braun exhibited fair executive function; normal levels of effort and engagement; average sustained attention; a linear, logical, thought process; and a good fund of knowledge (ECF No. 10, PageID #537, 606, 616, 625). Her school records include an Evaluation Team Report (ETR) on which Braun was evaluated on her basic employability skills using the Employability/Life Skills Assessment (ELSA) which measured her skills in eight categories: self-help, work habits, task related skills, work quantity, work quality, teacher/supervisor relationships, peer relationships, and work attitudes. (ECF No.

10, Page ID 457). Braun received the highest rating in sixteen areas: Personal Hygiene/Grooming,
Dressing Appropriately, Traveling Independently, Communicating Effectively,  Caring for Tools,
Materials, and Work Area, Practicing Safety Rules, Making Appropriate Choices/Decisions,
Accepting Constructive Criticism from Supervisor/Teacher, Following Directions from
Supervisor/Teacher: Seeking Help When Needed, Working Cooperatively with Peers, Showing
Respect for the Rights/Property of Others, Using Appropriate Language/Manners with Peers,
Developing/Seeking Personal Goals, Accepting Societal Rewards/Values, and Taking Pride in her
Work. (ECF No. 10, PageID #458). Braun scored in the middle or average range in eight areas:
Attendance/Punctuality, Staying on Task, Working Independently, Completing Work on Time,
Exhibiting Stamina, Adapting to increased Demands in  Workload, Recognizing/Correcting
Mistakes, and Demonstrating Initiative. (ECF No. 10, PageID #598). Braun did not receive any
scores in the below average range. (ECF No. 10, PageID #598).

These facts support a finding that Braun had a fair ability to function independently,
appropriately, effectively, and on a sustained basis in the area of concentrating, persisting, or
maintaining pace. Braun has failed to demonstrate how her school records or Dr. Magleby's
notation that she was "perhaps impulsive in responding" (ECF No. 10, PageID #537) demonstrate
more than a moderate limitation, especially given Dr. Magleby's finding that Braun's ability to
respond to the mental status inquiry was "fairly average." (ECF No. 10, PageID #537).
Accordingly, the ALJ's determination that Braun suffered moderate limitation in this area is
supported by substantial evidence.

> iv.    Adapt or manage oneself (paragraph B4).

Finally, the ALJ found that Braun has moderate limitations in managing herself. Braun
argues that the ALJ failed to note that a probate court had declared her incompetent and that her

parents were made her legal guardians. (ECF No. 14 at 18). Braun's assertion is factually incorrect. The ALJ's decision demonstrates that the ALJ was aware of this as she mentions on two separate occasions that Braun is under a guardianship. (*See* ECF No. 10, PageID #84 and 88). In fact, the ALJ listed the guardianship as support for her finding that Braun is moderately limited in this area.

Substantial evidence supports the ALJ's conclusion that Braun is moderately limited in her ability to adapt and manage herself. Despite Braun's guardianship status, the record demonstrates that she possessed a fair ability to function independently, appropriately, effectively, and on a sustained basis in the area of managing herself. Dr. Magleby reported that Braun exhibited functional adaptive skills, fair coping skills, money management skills, and fair insight and judgment. (ECF No. 10, PageID #535, 540). Dr. Magleby noted that Braun has a functional ability to manage money, an adequate diet, dresses and bathes herself, and takes care of her own personal hygiene. (ECF No. 10, Page ID #535). Braun knew how to perform household chores; walked her dog; and went to a local gym, shopped in stores, and watched television for pleasure (ECF No. 10, PageID #109-110, 214). Braun spent months on a beach vacation with a friend. (ECF No. 10, PageID #605). Moreover, as discussed above, Braun scored average or above average in all self-help skills areas on the ELSA. (ECF No. 10, PageID #457-458).

Accordingly, the ALJ's determination that Braun suffered moderate limitation in this area is supported by substantial evidence.

v.   Combination of Impairments

Braun also argues that the ALJ failed to consider the severity of her impairments in combination. (ECF No. 14 at 18). However, the ALJ specifically recognized her responsibility to determine whether Braun had a severe impairment or combination of impairments, and whether Braun had an impairment or combination of impairments that were equivalent to an impairment

that is listed in Appendix 1. (ECF No. 10, PageID #82, 83). The ALJ explained that she "must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)" and that "[i]f the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement" the claimant is disabled. (ECF No. 10, PageID #82). The ALJ then found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.08, and 12.11." (ECF No. 10, PageID #83).

Braun's argument is also unpersuasive because "the ALJ considered all the symptoms that were consistent with the medical evidence" in determining her RFC (*see* ECF No. 10 at 23-25). *See Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (citing *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990); *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 591–92 (6th Cir. 1987)).

Accordingly, substantial evidence supports the ALJ's conclusion that Braun does not have a combination of impairments that meets a listing.

vi.    Conclusion

Because the ALJ considered all symptoms consistent with the medical evidence and reasonably found that Braun suffered only moderate limitations in the paragraph B criteria, the ALJ did not err when she found that Braun did not have an impairment or combination of impairments that meets the requirements of Listings 12.04, 12.08, and 12.11.

3.    Substantial Evidence Supports the RFC

Prior to determining that Claimant could not perform her past relevant work at step four,

the ALJ determined Claimant's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). Here, the ALJ determined Claimant's RFC as follows:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to the performance of simple, routine, repetitive tasks, undertaken in a work setting free of production rate pace [as is found in assembly line work], which setting requires no interaction with the public and no more than occasional interaction with co-workers or supervisors, which setting is routine, in that it contemplates few changes in workplace tasks or duties.

(ECF No. 10, PageID #85). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Braun argues that the RFC was not supported by substantial evidence as it failed to include limitations including an isolated work environment, an off task percentage of twenty percent or more of more of the workday, or the need for redirection or retraining from a coworker or supervisor throughout the workday. (*See* ECF No. 14 at 21). The Commissioner argues that "[t]he ALJ accounted for [Braun]'s moderate mental limitations in her RFC assessment by limiting [Braun] to simple, routine tasks; no production rate pace; no interaction with the public; no more than occasional interaction with coworkers or supervisors; and a routine work setting with few changes in workplace tasks or duties[.]" (ECF No. 16 at 14). This Court agrees with the

Commissioner.

Substantial evidence supports the ALJ's conclusion that Braun did not require limitations requiring an isolated work environment and redirection or retraining throughout a workday. Braun argues that the OOD records demonstrate the need for these limitations. (*See* ECF No. 14 at 21). On May 8, 2018, OOD closed its file on Braun due to her inability to make progress. (ECF No. 10, Page ID #398). Braun states that "[i]t was harmful error on the part of the ALJ to not consider this report and include the observations and findings in her RFC." (ECF No. 14 at 12). However, the ALJ's decision demonstrates that she considered the OOD records and cited directly to them: "During a six-month course of vocational rehabilitation sponsored by the state of Ohio, she did change jobs several times, but in order to secure more hours, rather than as the result of any difficulties of adaptation (25E/26, 29)." (ECF No. 10, PageID #88). Moreover, the "report" does not include any "findings" and is merely a recitation of Braun's work history with OOD.

Braun argues that the records demonstrate her difficulties working, but as the ALJ noted, the records do not show that Braun could not work due to her impairments. An OOD tracking report indicates that Braun worked at Bob Evans from December 12, 2017 until December 29, 2017, when she asked to be reassigned due to a reduction in her weekly hours. (ECF No. 10, PageID #416). Braun then worked for Goodwill Industries of Akron from January 5, 2018 until January 29, 2018. The records do not indicate why Braun stopped working at Goodwill. She worked at Hunting Ridge Animal Hospital in Sharon Center, Ohio from January 9, 2018 until she quit on March 9, 2018. (ECF No. 10, PageID #423-426).  On January 18, 2018, the tracking record indicates that Braun was "doing just fine" in her placement at Hunting Ridge. (ECF No. 10, PageID #423). Braun points out that she left work on January 29, 2018 after only one hour claiming illness, but the record entry on February 14, 2018 indicates that Hunting Ridge was hoping to provide

Braun more hours over spring break, indicating that Hunting Ridge had no issue with Braun's attendance. The idea that Braun would work more hours during spring break was repeated on March 2, 2018. (ECF No. 10, PageID #425). On March 9, 2018, Braun quit Hunting Ridge; the entry provides no reason. (ECF No. 10, PageID #426). On March 19, 2018 OOD reached out to Braun regarding a new placement but was told that Braun was "on vacation". (ECF No. 10, PageID #426).

Braun's desire to work more hours is consistent in the entries involving Braun's employment at Bob Evans and Hunting Ridge. (ECF No. 10, PageID #416, 425). The OOD records do not indicate that Braun's impairments prevented her from working. On the contrary, the records indicate that she was doing well, especially when employed at Hunting Ridge.

Accordingly, substantial evidence supports the ALJ's finding that Braun's frequent job changes while at OOD was related to her desire to secure more hours, rather than as the result of any difficulties of adaptation and that the ALJ's decision not to include in the RFC limitations requiring an isolated work environment and redirection or retraining throughout a workday was supported by substantial evidence.

Additionally, Braun has not established the need for limitations for an off-task percentage of twenty percent or more of the workday. Although Braun suggests this limitation, and Braun's counsel questioned the vocational expert regarding this limitation, Braun has failed to cite any record evidence in support of this limitation. (*See* ECF No. 14 at 21).

Finally, Braun argues that the ALJ failed to properly consider the opinions of the medical experts. As discussed above, however, the ALJ did not err with respect to the expert opinions.

Accordingly, the Court finds that substantial evidence supports the RFC.

4. Substantial Evidence Supports the ALJ's Step Five Finding.

At step five the Commissioner has the burden of proof to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments already proven, whether there are jobs in the economy which a claimant can perform." *Id*. If a Claimant has not established limitations to be included in an RFC by step four, the burden does not shift to the Commissioner to prove an RFC – or its limitations – at step five. *Id*. at 392.

The Commissioner properly met his burden to determine that there is work available in the economy that the claimant can perform at step five. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks omitted). The Commissioner met this burden through the testimony of the vocational expert, who testified that work exists in the national economy that accommodates Claimant's RFC and vocational factors. Therefore, the ALJ found that she is not disabled.

During the hearing, the ALJ posed the following hypothetical:

> if you can assume a hypothetical individual the claimant's age and education with the past jobs you described and further assume that this individual would be limited to non-exertional limits, specifically limited to perform simple, routine, and repetitive tasks but not at a production rate pace, with only occasional interaction with supervisors and coworkers, never any interaction with the public, and would be limited to tolerating few changes in a routine work setting. Can this hypothetical individual perform past work?

(ECF No. 10, PageID #121). The vocational expert testified that such a person would not be able

to perform Claimant's past relevant work but that there are significant jobs in the national economy which such a person could perform:

> This individual could be a packager. This is coded DOT 920.587-018, normally medium work, at SVP 2, unskilled, producing a national number of 40,000 -- four zero thousand. This individual could be a laundry worker, 361.685-018, medium, and unskilled, SVP 2, nationally 3,800. And a third would be a[n] industrial cleaner aka sweeper, DOT 389.683-010, medium, unskilled, SVP 2, national number here is 11,000. Thank you.

(ECF No. 10, PageID #121-122).

In a second hypothetical, the ALJ inquired whether work would be available for a hypothetical individual who was off task for 20% of the workday. (ECF No. 10, PageID #122). The vocational expert testified:

> Not at that level in my opinion if someone is off task 20% or more on a consistent basis, in other words if we're dealing with a chronic problem here, cannot be sufficiently competitive enough or productive enough. I add, Your Honor, the DOT does not address this. This comes from a number of different areas, but most especially from my experience over a 25-year [INAUDIBLE].

(ECF No. 10, PageID #122). The ALJ further inquired "what about basically an isolated work environment, so no contact with the public or coworkers and minimal contact with a supervisor, would there be work available for that -- or with that restriction?" (ECF No. 10, PageID #122). The vocational expert responded "No, it stretches too far into the assessment for working in isolation. There's only three DOT industry codes out of 12,741 that would permit such isolation. There's no work for that person in my opinion." (ECF No. 10, PageID #122).

Claimant's attorney then inquired whether a hypothetical individual's requirement that they receive redirection or retraining from a coworker or a supervisor an extra four or five times per shift, would impact the individual's ability to maintain employment. (ECF No. 10, PageID #123). The vocational expert answered:

35

> Thank you, Counsel, excellent question. We'll set it in the general context of what would be the normal or abnormal supervision, the latter of course requiring an accommodation leading to no work. You can look at it quantitatively and qualitatively. Quantitatively normal supervision is occasional or wouldn't be work. There'd have to be at least occasional. And qualitatively if you're actually talking about retraining someone, especially in an unskilled environment, it's a bit more heavy-handed than just redirecting someone. The number of times per shift is you know that could be a point in a training period or two seconds of the training period so I'm not considering that too much. There's not enough information there, but on a qualitative side, retraining in an unskilled arena, it's just could not be there. So here I think that this person you've described requires more than normal supervision and accommodations because of the qualitative issues.

(ECF No. 10, PageID #123).

The initial hypothetical posed by the ALJ to the vocational expert properly included Claimant's limitations that the ALJ found were supported by the record. Although the ALJ and Claimant's attorney raised with the vocational expert additional limitations pertaining to the hypothetical, the ALJ concluded that these limitations did not apply to Claimant, which was supported by substantial evidence and within her "zone of choice". The vocational expert testified that there were approximately 54,800 jobs nationwide available to someone with Claimant's vocational profile, including the restrictions the ALJ found supported by the record as a whole. (ECF No. 10, PageID #90, 121-122).

The Court has concluded that substantial evidence supports the RFC as the ALJ fashioned it. And the ALJ's first hypothetical mirrored the RFC in this case. (*Compare* ECF No. 10, Page ID 121 ("assume a hypothetical individual the claimant's age and education with the past jobs you described and further assume that this individual would be limited to non-exertional limits, specifically limited to perform simple, routine, and repetitive tasks but not at a production rate pace, with only occasional interaction with supervisors and coworkers, never any interaction with

the public, and would be limited to tolerating few changes in a routine work setting.") *and* at 85 ("the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to the performance of simple, routine, repetitive tasks, undertaken in a work setting free of production rate pace [as is found in assembly line work], which setting requires no interaction with the public and no more than occasional interaction with co-workers or supervisors, which setting is routine, in that it contemplates few changes in workplace tasks or duties.")). Thus, the vocational expert's opinion is itself substantial evidence for the ALJ's Step 5 conclusion that there are jobs that exist in significant numbers in the national economy that Braun could do despite her limitations. *Smith v. Halter,* 307 F.3d 377, 378 (6th Cir. 2001) (citation omitted); *Baker*, 182 F. App'x at 500.

Braun states that "[t]he testimony proffered at the hearing…was not compliant with Social Security Ruling 00-4p and should be disregarded." (ECF No. 14 at 21). SSR 00-4p establishes that before an ALJ may rely on information provided by a vocational expert, the ALJ must identify whether the vocational expert's testimony conflicts with information listed in the DOT, and if so, the ALJ must seek a reasonable explanation for the conflict from the vocational expert and explain the resolution of such conflict in his/her written decision. SSR 00-4P (S.S.A.), 2000 WL 1898704. Braun, however, fails to explain how the vocational expert's testimony failed to comply with SSR 00-4p (*see* ECF No. 14 at 20-21) and it is not this Court's obligation to seek out and analyze arguments on Braun's behalf. Nonetheless, the ALJ fully complied with the requirements of SSR 00-4p. At the administrative hearing, the ALJ asked the vocational expert, "And is your testimony consistent with The Dictionary of Occupational Titles," and the vocational expert responded, "Yes it is". (ECF No. 10, PageID #122). In her decision, the ALJ indicated, "Pursuant to SSR 00-4p, the

undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles[.]" (ECF No. 10, PageID #90).

Accordingly, this issue has no merit.

5. Braun Was Not Entitled to a Supplemental Hearing Regarding the Vocational Evidence.

The Sixth Circuit has acknowledged that due process principles apply to Social Security proceedings. *Robinson v. Barnhart*, 124 F. App'x 405, 410 (6th Cir. 2005). Due process requires a social security hearing be "full and fair." *Laddy v. Astrue*, No. 4:11-cv-293, 2012 WL 776551, at *11 (N.D. Ohio Feb. 2, 2012), report and recommendation adopted by 2012 WL 777137 (Mar. 8, 2012). A claimant must have the opportunity to present all of the evidence, as well as confront the evidence against her. *Id.* (citing *Flatfor v. Chater*, 93 F.3d 1296, 1306 (6th Cir. 1996)). While there is not an absolute right to cross-examination for the development of a complete record, it should be available "where reasonably necessary to the full development of the case." *Flatfor*, 93 F.3d at 1307.

On January 17, 2019, after the hearing, Braun submitted a post-hearing memorandum arguing that a supplemental hearing was necessary. (ECF No. 10, PageID #429). In her post-hearing memorandum, Braun argued that: "since the vocational expert in this case did not provide a report prior to the hearing, the vocational expert's testimony was 'surprise testimony' which could not be reasonably prepared for in advance or, given the complexity of the vocational testimony, responded to immediately, without the ability to consult the vocational source materials relied upon by the vocational expert first." (ECF No. 10, PageID #429). She argued that "a supplemental hearing is necessary" under HALLEX I-2-6-80 (ECF No. 10, PageID #429). Counsel also proffered "rebuttal vocational evidence" consisting of a vocational opinion by a Mr. Heckman. (ECF No. 10, PageID #437-438). For the following reasons, the Court finds the ALJ

did not violate Braun's due process rights by failing to follow HALLEX provisions relating to supplemental hearings.[5]

Braun has not demonstrated that the vocational expert's testimony took her by surprise. HALLEX I-2-6-80. The Notice of Hearing clearly indicates that Braun's vocational concerns were to be decided at the hearing. (ECF No. 10, PageID #218-220). Braun's counsel received the resume of the vocation expert three months prior to the hearing and did not object to the vocational expert's qualifications or testimony at the time of the hearing. Having received the vocational expert's resume and been made aware of the issues to be determined at the hearing, Braun's counsel could have anticipated the vocational expert's testimony and could have prepared for cross examination of the expert. Braun's hearing counsel asked the vocational expert a hypothetical question regarding redirection or retraining four or five times per shift from a coworker or a supervisor, which led to a lengthy explanation and the vocational expert concluding that "this person you've described requires more than normal supervision and accommodations because of the qualitative issues." (ECF No. 10, PageID #123). Although the ALJ may have included (or excluded) certain limitations in her hypotheticals, or the vocational expert may not have provided the responses Braun wanted, these facts do not demonstrate that Braun was deprived of a "full and fair" hearing nor that such testimony was "surprise testimony" necessitating a supplemental hearing. Although

---

[5] HALLEX I-2-6-80 provides the framework in which a supplemental hearing is necessary. 1993 WL 751905. This section notes that a supplemental hearing is appropriate when: 1) certain testimony or a document takes the claimant by surprise, "is adverse to the claimant's interest, and presents evidence that the claimant could not reasonably have anticipated and to which the claimant is not prepared to respond;" 2) the ALJ believes additional testimony regarding the new issue is appropriate; 3) the ALJ, during the hearing, discovers that the testimony of additional person, who is not present, is needed; 4) the claimant or the ALJ wishes to present evidence, but cannot present it "without diminishing its probative value because of the absence of opportunity to for detailed examination or cross examination of the witness;" 5) an order or remand directs the ALJ to hold a supplemental hearing; 6) a request is made to cross-examine the author or provider of post-hearing evidence. HALLEX I-2-6-80.

the vocational expert's testimony may have been adverse to Braun, it could have been anticipated by her counsel and her counsel could have been prepared to respond. HALLEX does not require the ALJ to provide another hearing to Braun because she failed to raise arguments or issues while at the hearing provided to her.

Moreover, Braun has failed to set forth any specifics as to what testimony her counsel failed to anticipate or for which her counsel was unable to prepare. When a party fails to cite to specifics in the record, the court is under no obligation "to undertake an open-ended review of the entirety of the administrative record to determine (i) whether it might contain evidence that arguably is inconsistent with the Commissioner's decision, and (ii) if so, whether the Commissioner sufficiently accounted for this evidence." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*; 447 F .3d 477, 491 (6th Cir. 2006); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

In addition, the ALJ considered the rebuttal vocational evidence in the form of Mr. Heckman's opinion at Step Five:

> Mark Heckman, CRC offered a third party report, indicating that the claimant could not perform work involving only occasional interaction with co-workers and supervisors, owing to the need to interact with supervisors more often during the probationary period. He also indicated that the answers of the vocational expert during the hearing were inappropriate, owing to the age of the Dictionary of Occupational Titles. Mr. Heckman is reporting within the bounds of his professional certifications. However, the claimant had noted that in past workplaces, her tolerance for  interaction with supervisors was "alright" (4F/2), and during a six-month course of vocational  rehabilitation, there was no report of interpersonal difficulties (25E/26), (25E/29). The hypothetical questions developed during the hearing of necessity contemplate a period lengthier than a probationary period. Little weight is afforded this portion of his opinion. As to the second portion of his opinion, there is no information or argument so compelling as to cause the undersigned to disregard the testimony of the vocational expert provided during the hearing. Little weight is accorded this report.

(ECF No. 10, PageID #89).

With respect to any conflict between the testifying vocational expert and the opinion by Mr. Heckman, as this district has stated:

> [T]here is no requirement that the ALJ resolve conflicts between vocational evidence provided by either state agency employees or by other [vocational expert]s. (Tr. 282-92, 489). These are opinions, and thus can be weighed accordingly when reviewing the entirety of the record. Here, [vocational expert] Mosley based her opinion upon a review of the record evidence and Plaintiff's testimony about her job duties and physical requirements; the ALJ was entitled to rely on her experience in concluding what job title most closely mirrored Plaintiff's past work.

*Harrington v. Comm'r of Soc. Sec.*, No. 1:14 CV 1833, 2015 WL 5308245, at *7 (N.D. Ohio Sept. 10, 2015). Like *Harrington*, Braun "cites to no authority which requires the ALJ to review, let alone resolve conflicts, between opinion evidence of the [vocational expert]s or state employees." *Id*. Nonetheless, the ALJ considered and weighed Mr. Heckman's opinion, and explained why she found the opinion by Mr. Nimberger, the testifying vocational expert, more persuasive. (ECF No. 10, PageID #89). There is no error.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: April 7, 2021

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections

within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).